FILED

UNITED STATES DISTRICT COURT
DISTRICT COURT OF MASSACHUSETTS

2006 APR 11

AMOUNT $ 350.00
SUMMONS ISSUED
LOCAL RULE 4.1
U.S. DISTRICT WAIVER FORM
DISTRICT OF MASS. ISSUED
BY DPTY CLK
DATE 4-11-06

)
KEVIN DAY,                                )
                                          )
         Plaintiff,                       )
                                          )
v.                                        )   **CIVIL ACTION**
                                          )
STAPLES, INC.,                            )   NO. _____
                                          )
         Defendant,                       )
                                          )
                                          )   **06 - 10647 JLT**
                                          )
                                          )
_____ )   MAGISTRATE JUDGE _Alexander_

## COMPLAINT

## I. PARTIES

1.      Plaintiff Kevin Day ("Day") is a resident of West Yarmouth, Barnstable County,
Massachusetts and a citizen of the United States.

2.      Defendant Staples Inc. ("Staples") is a Massachusetts corporation with a principal
place of business located at 500 Staples Drive, Framingham, Middlesex County, Massachusetts.
Staples is a company with a class of securities registered under section 12 of the Securities
Exchange Act of 1934, or that is required to file reports under section 15(d) of the Securities
Exchange Act of 1934.

## II. JURISDICTION AND VENUE

3.      This court has federal question jurisdiction over Day's claim brought under 18
U.S.C. § 1514A pursuant to 28 U.S.C. § 1331.

4.    This court has supplemental jurisdiction over Day's state law breach of contract, promissory estoppel and wrongful discharge claims pursuant to 28 U.S.C. § 1367(a).

5.    Venue is proper in this district pursuant to 28 U.S.C. § 1391(a)(2) because a substantial part of the events giving rise to Day's claims occurred in the Eastern Division of the District of Massachusetts.

## III. FACTS

6.    On April 21, 2005 Cheryl Louie ("Louie"), a corporate recruiter for Staples, contacted Day by telephone and explained that Staples was interviewing candidates for Staples' Reverse Logistics Analyst employment opening.

7.    During this interview Louie promised Day that this particular position required that the employee travel across the Midwestern United States for approximately 70% of his or her work hours and spend approximately 30% of his or her work hours in Staples' Framingham, Massachusetts office. Louie's notes summarizing the April 21, 2005 interview are attached as Exhibit A.

8.    On April 28, 2005 Day had formal interviews with Louie and Staples' Mary-Ellen Julio ("Julio").

9.    During Day's interview Julio promised to Day that the Reverse Logistics Analyst position (the "Position") required that the employee travel approximately 70% of the time across the Midwestern United States and spend approximately 30% of the time in Staples' Framingham office.

10.    On or about May 5, 2005 Louie contacted Day by telephone and explained that he was Staples' top choice for the Position.

2

11.     During his May 5 conversation with Louie, Day explained that he was extremely interested in the Position.

12.     When contemplating whether or not to accept Staples' offer Day reasonably relied on the promises made by Staples that the Position would allow him to travel approximately 70% of the time across the Midwest.  Although, given his experience and qualifications, Day could have received employment offers from other employers that would have resulted in a higher salary, Day reasonably relied on the promises made by Staples and reasonably believed that the Position would allow him to explore other areas of the country, acquire frequent flyer/guest points and be paid per diem rates for meals when traveling.

13.     By letter dated May 6, 2005 (the "May 6 Offer") Staples offered Day the Position.

14.     The May 6 Offer stated that if Day accepted he would receive a monthly salary of $3,500 and a yearly salary of $42,000.

15.     A section of the May 6 Offer titled "New Hire Requirements" stated that "Staples requires associates at your level to sign and/or submit the following documents, which are enclosed, as a condition of employment."  The documents specified in the May 6 Offer and attached to the May 6 Offer were titled "Code of Ethics," "Proprietary & Confidential Information," and "Employment eligibility documents."

16.     At the bottom of the "New Hire Requirements" section of the May 6 Offer the following text appeared in boldface: "You must bring these documents with you on your first day.  You will not be allowed to begin work unless you submit and/or sign the required documents."

17.     On May 23, 2005 Day accepted the May 6 Offer by showing up at Staples' offices

and signing and submitting to Staples a Staples Code of Ethics and a "Code of Ethics

Acknowledgement" (See Exhibit B).

18.     By signing the "Code of Ethics Acknowledgement" Day agreed to the following:

> 2. I have complied with and will continue to comply with the
> terms of the Code of Ethics and all other policies and procedures
> that apply to my job.
>
> 4. I am responsible for notifying the company if I become aware
> of any potential legal or ethical violations involving Staples or its
> associates. I have the right to report any such concerns or
> violations openly or anonymously using any of the opinions stated
> in the Code of Ethics.

19.     Upon information and belief, from May 23, 2005 to August 6, 2005 Staples'

Associate Handbook stated "We expect associates to use the Code of Ethics, including the key

principles summarized below, as a guide in making the right ethical choices consistent with our

TeamCARE values."

20.     The Code of Ethics that was posted on Staples' website on August 5, 2005 (See

Exhibit C) featured a section titled "Take Responsibility For Reporting Ethics Complaints,

Including Any Concerns About Accounting Or Auditing Matters" (referred to hereinafter as the

"Complaints Section of the Code of Ethics").

21.     The Complaints Section of the Code of Ethics contained the following language:

> Staples will not tolerate retaliation against anyone who in good
> faith reports a violation or potential violation of this Code. This
> means that you will not be disciplined, fired, or discriminated
> against in any way for voicing ethical or legal concerns or
> reporting violations so long as you act honestly and in good faith
> (See Exhibit C).

4

22.     A subsection of the Complaints Section of the Code of Ethics titled "Complaints and Concerns Regarding Accounting, or Audit Matters" which focused on "concerns about questionable accounting, or auditing matters" contained the following language:

> Staples will not discipline, discriminate against, or retaliate against any associate who reports a complaint or concern in good faith (See Exhibit C).

23.     Upon information and belief, Staples' Code of Ethics did not change between May 23, 2005 and August 6, 2005.

24.     At all times during his employment with Staples, Day reasonably believed that Staples would adhere to the provisions of the Code of Ethics

25.     Day graduated from the University of Massachusetts at Amherst on May 22, 2005.

26.     Since he would start working at Staples' office in Framingham on May 23, 2005, Day had to make a decision with respect to living arrangements. Day, relying on the fact that Staples had promised that the Position required that he travel approximately 70% of the time and be in Framingham approximately 30% of the time, decided that it would be in his best interests economically to live with his parents in West Yarmouth, Massachusetts and commute to Framingham on the days he needed to be there.

27.     Based on the promises made by Staples, Day determined that he would need to commute to Framingham an average of six days a month. Since he would not have to pay for rent or utilities if he lived with his parents, and since he would only have to drive to Staples' office in Framingham approximately six days a month, Day decided it was in his best interests to live with his parents in West Yarmouth.

5

28.     The commute from West Yarmouth to Framingham was approximately 95 miles each way.

29.     Day, whose vehicle got approximately 19 miles per gallon on the highway, estimated that his round trip to work cost him approximately $30.00 per day and $600.00 per month in gas.

30.     The value of Day's vehicle was also depreciating due to the fact that his commute to Framingham put close to 1,000 miles on his car every week.

31.     Soon after he began working for Staples, Day realized that his department was manipulating accounting data in an unlawful manner that had negative financial ramifications for Staples (the unlawful manipulation of accounting data by Day's department that had negative financial ramifications for Staples shall be referred to herein as the "Data Manipulation").

32.     From July 11, 2005 through the date his employment was terminated by Staples Day reasonably believed that the Data Manipulation constituted a violation of (i) 18 USCS § 1341, 1343, 1344, or 1348; (ii) any rule or regulation of the Securities and Exchange Commission; and/or (iii) any provision of Federal law relating to fraud against shareholders.

33.     From July 11, 2005 through the date his employment was terminated by Staples Day honestly and in good faith believed that the Data Manipulation was a questionable accounting matter that violated Staples' Code of Ethics.

34.     From July 11, 2005 through the date his employment was terminated by Staples Day believed that the Data Manipulation violated federal law, defrauded Staples' shareholders and possibly exposed him to criminal liability. As such, the Data Manipulation was not a purely internal matter.

6

35.     On July 14, 2005 Day spoke with Julio, Day's boss, and explained his concerns regarding the Data Manipulation.

36.     Julio responded by stating that Day "can either go along with what we are doing or decide if you want to be a part of this team anymore."

37.     After his July 14, 2005 meeting with Julio, Day became concerned that if Julio forced him to continue to participate in the Data Manipulation he could potentially be criminally liable. Therefore, Day drafted a letter that night which he planned to deliver the next day to Staples' General Counsel and VP of Human Resources.

38.     On July 15, 2005 Day and Julio again discussed Day's concerns regarding the Data Manipulation.

39.     That same day, after Julio was again unreceptive to Day's concerns about the Data Manipulation, Day submitted a signed letter (the "July 15 Letter") by hand delivery to Doreen Nichols ("Nichols") of Staples' Human Resources department. A copy of the July 15 Letter is attached hereto as Exhibit D.

40.     Although Day intended to have the July 15 Letter hand delivered and sent by electronic mail to Staples' General Counsel, Jack VanWoerkom, and Staples' VP of Human Resources, Nichols discouraged Day from doing so.

41.     Nichols then told Day that she would hand deliver the July 15 Letter to "the appropriate personnel."

42.     Upon information and belief, the July 15 Letter was never delivered to Jack VanWoerkom or Staples' VP of Human Resources.

43.     In the section of the July 15 Letter titled "MISREPRESENTATIONS IN JOB DESCRIPTION" Day explained that although he had relied on Staples' promise that he would be

7

traveling approximately 70% of the time, as of July 15, 2005 his only travel had been a two week training session in California.

44.    After delivering the July 15 Letter Day spent the rest of his time at Staples working in Staples' Framingham office.

45.    In the section of the July 15 Letter titled "FORCED PARTICIPATION IN FRAUDULENT ACTIVITY" Day articulated his concerns about the Data Manipulation.

46.    In the July 15 Letter Day specifically stated:

> Without going into complete detail, I or any auditor can look in the AS400 system and find hundreds, if not thousands, of cases of inaccurate reporting of figures, accounting fraud and general unethical behavior, much of it dealing with defrauding the very customers that make this company successful. Nevertheless, I fear that if I don't go along with the status quo, like I am being told I need to do, I stand the chance of being terminated.
>
> Having watched the news recently and seen all of the corporate accounting scandals and the prosecution of individuals involved, I fear that I could be used as a scapegoat if someone looked into what we as a team do on a daily basis. My personal user ID is attached to every single item that I adjust in the AS400 as is the case with everybody on my team, and I have in the past been pressured into doing things that I know deep down were wrong. I feel that if it ever came down to it and we were called out on an issue, Mary-Ellen would put the blame squarely on my shoulders. I honestly feel that I am complicit in a corporate scandal (see Exhibit D).

47.    On July 18, 2005 Day contacted Anne-Marie Borque ("Borque") of Staples' Human Resources department by e-mail and inquired about the possibility of setting up a meeting to discuss the issues raised in the July 15 Letter.

48.    Day's July 18 e-mail to Borque noted in part that "Every day that I am at work here after stating my case Friday makes me feel as though I am doing something wrong" (See Exhibit E).

8

49.    Later on July 18, 2005 Day met with Borque and Ellen Kruse ("Kruse"), another member of Staples' Human Resources department. During this meeting Day articulated his concerns about the Data Manipulation.

50.    Despite the fact that she had not investigated Day's claims, during the July 18 meeting Kruse said to Day "personally, I think you are wrong."

51.    At the end of the July 18 meeting Borque and Kruse agreed to investigate Day's allegations and respond back to him.

52.    On July 19, 2005 Julio sent an e-mail to Borque and Zalitas which stated in part "I recommend immediate termination of [Day's] employment with Staples, Inc." That e-mail also stated in part:

> [Day] stated he feels that our accounting methods are inaccurate. He stated the information that we send to Wall Street is inaccurate and if they had any idea of our reporting practices they would investigate leaving our company share holders to suffer the consequences. He stated our practices are deceitful and that he is being asked to lie about returns.

53.    On July 20, 2005 Day met with Julio, Zalitas, Borque and Kruse.

54.    While Day was under the impression that the July 20 meeting would focus on his Data Manipulation allegations, that topic was barely addressed. Instead, this meeting focused on Day's concerns about misrepresentations regarding his job description.

55.    During the July 20 meeting the meeting participants set up a plan to ensure that Day's job duties would mirror those described in his job description.

56.    Day sent an e-mail on July 21, 2005 to Borque and Kruse that stated in part:

9

> In response to our meeting from Monday, Ellen had told me that you were going to get me answers on how I may be misunderstanding this entire process. In fact Ellen's comment was, "Personally, I think you are wrong." I would like some feedback. I believe somebody may be looking into this currently but am not sure. I also have not been contacted by Nan Stout as I was notified. I believe that I have brought up some issues that needed to be addressed in my letter to HR dated 7/15 as far as fraudulent activity (based on the dictionary definition of fraud) and unethical behavior. I hope that I will be contacted to speak with someone about this. I hope that this is being addressed (see Exhibit F).

57.    Day's July 21, 2005 e-mail to Borque and Kruse also stated in part:

> SpeeDee Delivery Service is an egregious example of how canceling and reissuing orders spiraled out of control but nobody knew, besides our department, because we hid the facts. It took me personally [to] get to the bottom of it, a problem that has been brushed aside for months due to no sense of urgency. This is another issue that needs to be addressed. It is proof how a company who's [sic] problems are being hidden by canceling and reissuing is costing this company money that I couldn't possibly begin to calculate (See Exhibit F).

58.    On July 21, 2005 Day met with Kruse and Robert McGrath ("McGrath") of

Staples' Loss Prevention department and explained his concerns regarding the Data

Manipulation.

59.    At the conclusion of the July 21 meeting McGrath asked Day to e-mail him with

any additional information Day had to support his Data Manipulation claims.

60.    Day sent McGrath an e-mail later on July 21 with additional information to

support his Data Manipulation claims.

61.    On July 23, 2005 Complainant sent McGrath another e-mail in order to support

his Data Manipulation claims (see Exhibit G). That e-mail stated in part:

10

> In my opinion, the returns issue is costing this company, well I couldn't even guess how much, but even if it is $50.00 and someone could have done something about it, that is too much.

> I still feel that when I said that our responsibility as a public corporation is to the Shareholders (through the customers), I was right. Although this nowhere comes near a MCI/Worldcom situation, that proves that you can make your customers happy and still steal from the shareholders. We, as agents of the shareholders, who invest their money assuming that we are working in their best interests to give them the very best ROI, need to think that every decision that we (the employees) make should be with their (the investors) best interests in mind. When I see a situation, like the returns process, where people are making problems that need to be addressed go away, which in my opinion is to further their own careers and look good to those who might believe that they are doing things the right way, it makes me angry, which is why I brought this up in the first place. If shareholders were privy to information on the inner workings of the companies they invest in and see that this type of thing was going on, the theory would be that they would withdraw their money and invest it somewhere else. If Staples didn't need investors' money, Staples would not have gone public and remained a private company (See Exhibit G).

62. On July 25, 2005, despite the fact that he had failed to contact Staples' General Counsel or Staples' Audit Committee about Day's Data Manipulation claims, McGrath sent Day an e-mail in which he stated that "after a thorough review, I don't find any evidence of fraud or unethical behavior" (See Exhibit G).

63. McGrath failed to talk to any member of Day's department during his "thorough investigation" of Day's Data Manipulation claims.

64. McGrath called Day by the wrong name in McGrath's July 25 e-mail (See Exhibit G).

65. On August 3, 2005 Day met with Greg Igo, Steven Bussberg, McGrath and Kruse.

11

66. Day had been led to believe that during the August 3 meeting McGrath and the other meeting participants would present him with a detailed explanation as to why his Data Manipulation allegations did not constitute fraudulent activity. However, the meeting ended before Day received any type of satisfactory explanation.

67. Day then scheduled a follow-up meeting for August 5, 2005 so that the discussion regarding his Data Manipulation claims could be continued.

68. On August 5, 2005 Day met with Kruse and McGrath under the assumption that Day's Data Manipulation claims would be addressed.

69. McGrath started the August 5 meeting by asking Day "Has anyone ever called you a perfectionist? Because we think you are a perfectionist at an imperfect company."

70. McGrath then informed Day that this was his last day working for Staples.

71. McGrath then suggested that Day needed to take some law classes so that he could understand the definition of fraud and then falsely stated that Staples' Board of Directors had not created an Audit Committee that was to be notified of whistleblower claims.

72. As McGrath escorted Day away from his cubicle, McGrath admitted that he had never discussed Day's Data Manipulation allegations with Julio and in fact had never even met Day's boss.

73. On August 5, 2005 Day was fired by Staples in retaliation for the fact that he reasonably, honestly and in good faith reported questionable accounting that was taking place at Staples that he reasonably believed constituted a violation or potential violation of the Code of Ethics and federal law.

12

74.    At no time prior to Day's August 5, 2005 termination was Day provided with any type of verbal or written warning by any Staples employee that his employment at Staples was in jeopardy of being terminated.

75.    On September 28, 2005 Day filed a complaint against Staples with the United States Department of Labor pursuant to the whistleblower protection provision contained in Section 806 of the Corporate and Criminal Fraud Accountability Act of 2002, Title VIII of The Sarbanes-Oxley Act of 2002, 18 U.S.C. § 1514A (hereinafter the "Act").

76.    On March 27, 2006 the Department of Labor issued a decision which confirmed that Day could remove his case to United States District Court (See Exhibit H).

## IV. CAUSES OF ACTION

### Count I

(Staples' Violation of 18 U.S.C. § 1514A)

77.    Day repeats and re-alleges herein the allegations contained in paragraphs 1 through 76 above.

78.    Staples violated Day's rights under the Act, as (1) Day engaged in protected activity under the Act; (2) Staples was aware of the protected activity; (3) Day suffered an adverse employment action; and (4) circumstances are sufficient to raise an inference that the protected activity was likely a contributing factor in the unfavorable action. *See* 29 C.F.R. §1980.104(b); *Collins v. Beazer Homes USA, Inc.*, 334 F. Supp.2d 1365, 1375 (N.D. Ga. September 4, 2004).

79.    Day engaged in protected activity under the Act since he provided information and assisted in an investigation regarding the Data Manipulation which he reasonably believed constituted a violation of section 1341, 1343, 1344, or 1348, any rule or regulation of the

13

Securities and Exchange Commission, or any provision of Federal law relating to fraud against shareholders, and that information or assistance was provided to or the investigation was conducted by a person with supervisory authority over Day or such other person working for Staples who had the authority to investigate, discover, or terminate misconduct.

80.    Staples was aware of the fact that Day engaged in protected activity under the Act since Day clearly communicated the protected activity to Staples via written and oral communications.

81.    Julio attempted to terminate Day's employment on July 19, 2005 and Day's employment was terminated by Staples on August 5, 2005. Thus, undisputed facts establish that Day suffered two separate adverse employment actions.

82.    The small amount of time between Day's engaging in protected activity and his termination is sufficient evidence to raise an inference that the protected activity was likely a contributing factor in the unfavorable action (Day first voiced his concerns to Staples on July 14, 2005 and continued to engage in protected activity while employed by Staples, and on August 5, 2005, a mere sixteen work days after Day first engaged in protected activity, Day's employment was terminated by Staples*). *See, e.g., Collins*, 334 F. Supp. at 1379 ("The Court finds that the temporal proximity between the time when Plaintiff made her complaints and the time she was terminated is sufficient to establish circumstances which suggest that protected activity was a contributing factor to the unfavorable personnel action"); see also 29 C.F.R. 1980.104(b)(2) (stating that for purposes of determining whether complaint on its face demonstrates causation sufficient to investigate "normally, the burden is satisfied, for example, if the complaint shows that the adverse personnel action took place shortly after the protected activity").

83. As a result of Staples' violation of Day's rights under the Act, Day has sustained damages.

## Count II

(State Law Breach of Contract)

84. Day repeats and re-alleges herein the allegations contained in paragraphs 1 through 76 above.

85. The Code of Ethics, which Day signed and submitted to Staples, created contractual obligations between Staples and Day. Day had a reasonable expectancy that Staples would adhere to the provisions of the Code of Ethics and, as such, was entitled to the protections provided in the Complaints Section of the Code of Ethics.

86. Staples breached Day's contractual rights under the Complaints Section of the Code of Ethics when Staples fired Day after Day's reasonable, honest and good faith reports regarding the Data Manipulation that Day believed constituted a violation or potential violation of the Code of Ethics and federal law. See, e.g., Ferguson v. Host Int'l, 53 Mass. App. Ct. 96 (2001).

87. As a result of Staples' breach of Day's contractual rights under the Code of Ethics, Day has sustained damages.

## Count III

(State Law Promissory Estoppel)

88. Day repeats and re-alleges herein the allegations contained in paragraphs 1 through 76 above.

89. On multiple occasions before Day accepted the Position, Staples promised to Day that the Position required that the employee travel approximately 70% of the time across the

15

Midwestern United States, with the remaining time to be spent working in Staples' Framingham office.

90.     Staples should have reasonably expected that its promises with respect to travel time would induce actions of a definite and substantial character by Day.

91.     Staples' promises with respect to travel time did in fact induce actions of a definite and substantial character by Day, as Day accepted the Position based in part on these promises and potentially passed on other higher paying jobs. In addition, as a result of Staples' promises with respect to travel time Day decided to live with his parents and commute to work, which resulted in (without limitation) the depreciation of the value of Day's car and the payment of large sums of money to keep his car filled with gas.

92.     By reason of Day's detrimental reliance on the false promises made by Staples with respect to travel, Day has sustained damages.

## Count IV

(State Law Wrongful Discharge in Violation of Clearly Established Public Policy)

93.     Day repeats and re-alleges herein the allegations contained in paragraphs 1 through 76 above.

94.     In Massachusetts it is well settled that an employer may not terminate an employee if the termination violates a clearly established public policy. Thus, redress is available for employees who are terminated for asserting a legally guaranteed right, for doing what the law requires, for refusing to do that which the law forbids and/or for the performance of an important public deed.

95.     Day's employment with Staples was terminated by Staples because Day made allegations regarding the Data Manipulation (which was not a purely internal matter) and as such

16

asserted a legally guaranteed right, did what the law requires, refused to do that which the law forbids and/or performed an important public deed.

96.     Legislative history in Massachusetts demonstrates that the protection of employee "whistleblowers" from retaliatory actions by their employers is clearly established public policy. For example, Massachusetts state statutes protect various employees from retaliatory action after they object to or refuse to participate in any activity that they reasonably believe is in violation of the law. See, e.g., Mass. Gen. Laws ch. 149, § 185 and Mass. Gen. Laws ch. 149, § 187.

97.     By firing Day in retaliation for his reasonable, honest and good faith report of Data Manipulation, Staples has violated a clearly established public policy.

98.     By reason of the foregoing, Day has sustained damages.

## IV.  RELIEF REQUESTED

WHEREFORE, Day prays that this Court:

99.     Enter judgment in favor of Day against Staples and award Day the following:

    a.     All relief necessary to make Day whole;

    b.     Compensation for back pay and benefits (including, without limitation, retirement benefits, medical benefits and fringe benefits) with interest for the time between Day's termination by Staples on August 5, 2005 and the conclusion of this litigation;

    c.     Compensation with interest for the expenses incurred by Day as a result of his commute to work while employed by Staples including, without limitation, the depreciation of the value of Day's car and the cost to keep his car filled with gas;

    d.     Due to the hostility between Day and Staples, Day waives his right to reinstatement and instead requests compensation for future lost earnings of wages and benefits

17

(including, without limitation, retirement benefits, medical benefits and fringe benefits) with interest for Day's life expectancy;

    e.    Compensation with interest for all expenses incurred by Day in his attempt to rehabilitate his professional reputation and find new employment;

    f.    Compensation for emotional distress and mental anguish suffered by Day as a result of Staples' egregious and outrageous wrongful discharge of Day in violation of Massachusetts public policy;

    g.    Attorney's fees and other litigation costs with interest;

    h.    All other relief that this Court sees fit to award; and

    i.    Given that Staples' egregious and outrageous wrongful discharge of Day in violation of Massachusetts public policy gives rise to an action sounding in tort, Day requests that he be awarded punitive damages.

100.    Day hereby requests a trial by jury for all of his claims.

Respectfully submitted,

KEVIN DAY

Kevin M. Day
Pro Se Plaintiff
345 Camp Street #106
West Yarmouth, MA 02673
(413) 237-2254

Dated: April 11, 2006

18

## VERIFICATION

I, Kevin Day, being of legal age, do hereby depose and say that I have read the contents of the above complaint, know the contents thereof, and affirm that the same are true to my personal knowledge, except where statements are made on information and belief, and there I believe them to be true.

Signed under the penalties of perjury, this 11th day of April, 2006.

Kevin Day

19

## **LIST OF EXHIBITS**

EXHIBIT A        Cheryl Louie's Notes From April 21, 2005 Interview With
                 Kevin Day

EXHIBIT B        Code of Ethics Acknowledgement Signed by Kevin Day on
                 May 23, 2005

EXHIBIT C        Staples Code of Ethics as of August 5, 2005

EXHIBIT D        July 15, 2005 Letter

EXHIBIT E        July 18, 2005 E-mail Sent by Kevin Day to Anne-Marie
                 Borque

EXHIBIT F        July 21, 2005 E-mail Sent by Kevin Day to Anne-Marie
                 Borque and Ellen Kruse

EXHIBIT G        July 23, 2005 and July 25, 2005 E-mail Exchange Between
                 Kevin Day and Robert McGrath

EXHIBIT H        March 27, 2006 Order Dismissing Complaint (2006-SOX-
                 00034)